Alex RUDOLPH

v.

STATE.

3 Div. 44.

Court of Appeals of Alabama.

Aug. 18, 1959.

MacDonald Gallion, Atty. Gen., and Jas. W. Webb, Asst. Atty. Gen., for the State.

Hugh M. Caffey, Jr., Brewton, for appellant.

CATES, Judge.

Rudolph was indicted and convicted for being an accessory after the fact to murder. Code 1940, Tit. 14, § 15. After a nonjury trial, Rudolph was fined $150.

The evidence for the State tended to show:

On November 16, 1957, Beulah Mae Turk (Rudolph's purported principal), her mother, Lilly Hill, her sister, Sadie Mae Feagin, and Emmett Jackson were at Alex Rudolph's house.

They had killed a hog, scalded the carcass, and Alex, Emmett and Sadie Mae were scraping the hairs off the hide.

Emmett left the others, and the next testimony we have of him is Beulah Mae's telling of her stabbing him. Alex was not a witness to the stabbing, but Beulah Mae testified, without objection, that Alex knew she had stabbed Emmett.

Beulah Mae and Alex picked up Emmett and put him in Alex's pickup truck and drove off to Beulah Mae's place. Alex then apparently went to a store and sent word for the sheriff.

■ The crime here charged has three elements: (1) knowledge of the accessory of the principal's crime, (2) commission of a *complete* felony, and (3) active aid (passivity excluded). Wharton's Criminal Law and Procedure, § 112; Bishop, Criminal Law (9th Ed.), § 693; Russell on Crime (11th Ed.), p. 173; 14 Am.Jur., Criminal Law, §§ 102–104; 22 C.J.S. Criminal Law §§ 95–99.

Our statute adds: " * * * with intent to enable him [i. e., the principal] to avoid or escape from arrest, trial, conviction, or punishment."

Beulah Mae's testimony as to whether or not Emmett Jackson was dead when she and Alex put him in the truck was vague. It runs:

"Q. How many times did you stab him? A. Once.

"Q. * * * Now was that sufficient to cause his death? A. (No answer)

"Q. That killed him didn't it? A. That's right."

\* \* \* \* \* \*

"Q. Now was Emmett Jackson living or dead at that time? A. Well I wouldn't say—if I had to say I'd say he was dead."

On cross-examination, Beulah Mae was asked:

"Q. Was Emmett Jackson dead or alive at that time? A. Well just like I said [a]while ago, I don't know."

■ Had the State rested here, we should have had to reverse because, to make one an accessory after the fact to murder, the help furnished the principal must be given after the murder is complete. iv. Bl. Com. 38; Harrel v. State,

39 Miss. 702, 80 Am.Dec. 95. See also Crosby v. State, 179 Miss. 149, 175 So. 180.

Beulah Mae went on to testify that, in her and Alex's taking Emmett to her house, they were carrying the wounded man "away from any sort of medical attention, rather than toward it."

If Emmett were then alive, his transportation could be viewed as complicity by Alex in what later became murder.

There is no dispute that Emmett was a corpse when Alex took him from the pickup truck and laid him in the yard at Beulah Mae's home. We view this as the crucial act of this record.

When the sheriff arrived, Beulah Mae told him in Alex's presence that she had stabbed Emmett "down at the well—at the church" about 200 yards at the most from her house. The solicitor then asked her, "And what did he [Alex] have to say about it?" She replied, "Nothing."

From her testimony on cross-examination, it appears Alex was the instigator of her lying about the scene of death.

"Q. Where did you tell the sheriff you killed Emmett Jackson? A. I told him I killed him down there at the well.

"Q. That's in Conecuh County, is that correct? A. That's right.

"Q. But you testified that you didn't kill him down at the well, that you killed him around at Alex Rudolph's house, is that correct? A. That's right.

"Q. Now whose idea was it to tell him you had killed him around there at the well? A. It was Alex's idea.

"Q. What reason did he give you for telling that lie? A. I reckon he called hisself clearing himself.

"Q. Did he try to clear you in any way? A. Not as I knows of.

"Q. Well Alex didn't need to clear himself did he, he had no connection with that killing did he? A. No, sir.

"Q. He wasn't even present at the spot that you cut Emmett Jackson, is that correct? A. That's right.

"Q. You did the cutting all by yourself? A. That's right.

"Q. And it is your belief that Alex was trying to clear himself in some way, is that correct? A. That's the only way I can figure it out."

On direct examination, Mr. James Brock, the sheriff, testified in part:

"A. I asked him did he know anything at all about it, and he said no, he just happened by there and Beulah Mae flagged him down and that he come up there and saw the man laying there and he went and called us, that that was all he knew.

.* * .* * * *

"Q. But the effect of what Beulah Mae was telling you and what Alex Rudolph was telling you was the same, and that was that the man had been stabbed down there within a 150 or 200 yards of the house? A. He wasn't denying any of that, he was listening to it, and he said he didn't know anything about it.

"Q. He didn't know anything about the killing—all he knew that Beulah Mae had flagged him down and sent him after the law? A. Yes sir.

"Q. Let me ask you Mr. Brock, did you charge Alex Rudolph at that time with complicity in this? A. No sir, we only got him as a witness.

"Q. I'm going to ask you to tell the court how long was it before you found out there was other circumstances? A. It was about a week from then. At that time we got Beulah Mae to carry me down to where it happened and there was no sign there

where it happened, none whatsoever. No scuffling around in the road or where he fell, and we come on and got to hearing a little something, which we was listening for, and I went back down there and found out from some other source that Rudolph had come by the house running mighty fast that day and I left word for him to come in and Beulah Mae's sister I believe, which they come in on Sunday morning and Rudolph come walking in to me and said I done told you a lie, I want to tell you the truth now."

From Mr. Brock's cross-examination, we find:

"Q. And Beulah Mae admitted in your presence, in the presence of Mr. Kent, and in the presence of Lonnie Huffman, in the presence of Louis Bonham, and the children you say were there, that she had stabbed Emmett Jackson? A. That's right.

"Q. But she lied to you as to the place where she had stabbed him? A. That's right.

"Q. Now did Alex Rudolph over hear her tell that lie? A. He overheard it, I asked all of them did they know any facts about it and none of them knew nothing.

"Q. He denied any knowledge of it all together? A. He denied anything at all, he just happened by."

The defense's motion to exclude the State's evidence was based on the following argument:

" * * * Any statement or any falsification that Alex Rudolph might have made down there is completely immaterial as to the expression of an intent to enable Beulah Mae to avoid arrest and conviction and trial. * * "

Since the State failed to prove that Emmett Jackson was dead when he was put in the truck, the act of aiding after murder only began when the corpse was taken down at Beulah Mae's yard.

Here there was no affirmative act to conceal the commission of the crime, merely the locus criminis. Whether Beulah Mae stabbed Emmett at Alex's house or by the church yard well could have been a circumstance to help acquit Beulah Mae. Shifting the body, if successful, could have put the scene presumably at a more advantageous place insofar as getting away from any other eyewitness. Moreover, evidence of the scene of a homicide is generally admissible. Johnson v. State, 247 Ala. 271, 24 So.2d 17.

The intent, under the record here, is a question of fact for the lower court and we see no abuse.

We have carefully considered the arguments of counsel and have reviewed the entire record. From this we consider the judgment below is due to be

Affirmed.